## Adams Express Company *versus* Schlessinger.

1. Several trunks were transported by an express company and after remaining in their office for a considerable time an order of court under the Act of December 14th 1863 was obtained to sell them for freight, &c.   *Held,* that this order did not protect the company for selling the trunks unopened and locked and without exposing the contents.

2. The plaintiff testified as to the character and value of the contents of the trunk.   Evidence that the plaintiff was a lady of wealth, &c., and that the goods described by her were such as are possessed by persons in similar circumstances in life, was admissible.

3. An agreement by an agent of a corporation made in the course of the business intrusted to him is binding on the corporation although in excess of his instructions.

4. Tanner *v.* Oil Creek Co., 3 P. F. Smith 411, recognised.

February 9th 1874.   Before AGNEW, C. J., MERCUR and GORDON, JJ.   SHARSWOOD, J., at Nisi Prius.

Error to the District Court of *Philadelphia:* No. 27, to July Term 1872.

This was an action on the case brought March 4th 1871, by Mary E. Schlessinger against The Adams Express Company.

The first count charged that the plaintiff delivered to the defendants divers goods (which were described) of the value of $20,000, to be taken care of and safely kept and delivered to the plaintiff on demand; that the defendants did not take proper care of the goods, nor deliver them when demanded, but by their negligence the goods were lost; the second count charged that the defendants had the care of the goods and did not take due care of them; the third count was in trover.

The plaintiff's claim was, that having four trunks containing valuable articles of clothing, silverware, books, &c., in New York, she employed the defendants to have them brought for her to Philadelphia; that after their arrival at Philadelphia, she called at the office of the company, and not being ready then to remove

[Adams Express Co. *v.* Schlessinger.]

them, the agents of the company then told her they might remain there for a year.

In less than a year the plaintiffs, by virtue of an order of the Court of Common Pleas, under the Act of December 14th 1863, Pamph. L. 1127, 1 Br. Purd. 220, pl. 6, *et seq.*, sold the trunks unopened and she thereby lost the goods.

The act provides:—

" Sect. 1. In all cases in which commission merchants, factois and all common carriers, or other persons, shall have a lien, under existing laws, upon any goods, wares, merchandise or other property, for or on account of the costs or expenses of carriage, storage or labor bestowed on such goods, wares, merchandise or other property, if the owner or consignee of the same shall fail or neglect or refuse to pay the amount of charges upon any such property, goods, wares or merchandise, within sixty days after demand thereof made personally upon such owner or consignee, then and in such case it shall and may be lawful for any such commission merchant, factor, common carrier or other person having such lien, as aforesaid, after the expiration of said period of sixty days, to expose such goods, wares, merchandise or other property to sale at public auction, and to sell the same, or so much thereof as shall be sufficient to discharge said lien, together with costs of sale and advertising : *Provided*, That notice of such sale, together with the name of the person or persons to whom such goods shall have been consigned, shall have been first published for three successive weeks in a newspaper published in the county, and by six written or printed handbills, put up in the most public and conspicuous places in the vicinity of the depot where the said goods may be.

" Sect. 2. Upon the application of any of the persons or corporations having a lien upon goods, wares, merchandise or other property, as mentioned in the first section of this act, verified by affidavit, to any of the judges of the Courts of Common Pleas of this Commonwealth, setting forth that the places of residence of the owner and consignee of any such goods, wares, merchandise or other property are unknown, or that such goods, wares, merchandise or other property are of such perishable nature or so damaged, or showing any other cause that shall render it impracticable to give the notice as provided for in the first section of this act, then and in such case it shall and may be lawful for a judge of the city or county in which the goods may be, to make an order, to be by him signed, authorizing the sale of such goods, wares, merchandise or other property, upon such terms as to notice as the nature of the case may admit of, and to such judge shall seem meet: *Provided*, That in cases of perishable property, the affidavit and proceedings required by this section may be had before a justice of the peace.

" Sect. 3. The residue of moneys arising from any such sales,

either under the first or second sections of this act, after deducting the amount of the lien as aforesaid, together with costs of advertising and sales, shall be held subject to the order of the owner or owners of such property."

The case was tried, February 24th 1874, before Thayer, J.

The plaintiff testified :—

"I don't remember the dates exactly. I called at Adams Express Office and asked the party behind the counter where I could have trunks brought from New York.  He directed a colored man to take me up to the counter. I told the clerk I wanted to have my trunks brought from New York. * * * I showed him a letter from Mrs. Lamporte, requesting me to have the trunks taken away. They told me the trunks would be in Philadelphia within a few days. I don't remember how many days. At the end of the time I called and saw my trunks. The clerk pointed them out to me. I asked him then whether I should pay the freight, which was eight dollars. I handed him (Granger) a ten-dollar note, and he said I should pay for them when I took them away. Then I asked him if he would keep them for me on storage, and what it would cost. He said that they were not allowed to take storage but that they would keep my trunks. I asked him how long. He said 'one year, no longer.' At the end of something like two months, I called there with my son, and he went down stairs. They took him down in the basement, He took a book out of one of the trunks, and came up-stairs with the book with him, and told me to ask the gentleman again in his presence, which I did; and he (Granger) made exactly the same answer—that was, that he would charge no storage if I could pay them for the transportation when I took them away, and that they would be kept one year. He said, 'we are not allowed to take storage; we will keep them for nothing and for one year.' I never went there again until the month of February. Then I came to Adams Express to get my trunks to put them at Mr. Ohl's; then they told me my trunks were sold. That was the last week in April 1870 I got the letter."

*          *          *          *          *

The plaintiff was then asked, "What did your four trunks contain?" This was objected to by the defendants; and being examined by the defendants she said: that she had packed them in January and ordered them to Philadelphia in April and they had been in her house in the intermediate time; she saw the trunks in February; she knew what was in them when she left New York; they had good locks and keys; she had not seen them again until after she received the letter of April 1870 and then they were in the same condition as when she left them at New York, without any appearance of having been broken open: in New York they had been in charge of Mrs. Lamporte.

The witness then testified in chief, very much at large, what were

[Adams Express Co. v. Schlessinger.]

the contents of the trunks and the value of the individual articles enumerated by her.

The defendant renewed the objection to the plaintiff's testimony, "upon the ground that the witness's knowledge of the delivery of these trunks to the carrier is not sufficient evidence of the delivery of these articles which she has enumerated in her testimony, inasmuch as she did not know what those contents were when they were delivered to the carrier; also on the ground of the looseness of the plaintiff's testimony in respect to these articles being in the trunks at the time of the delivery to the carrier."

The objection was overruled by the court, and a bill of exceptions was sealed.

She testified also that she called afterwards for the goods, and was told that they had been sold for the freight.

The plaintiff gave evidence by her son, that on the 3d of July 1870, he went with his mother to the Adams Express Company's office and got a book from one of the trunks and at that time one of the agents told her in answer to a direct question that they would keep the trunks for a year; that he made a list of their contents in April or March 1871; but had made no list at the time he helped to pack them. He testified also from the list which he had made what were the contents and their value.

The plaintiff proposed to prove by Judge Pierce that she had been a lady of wealth, and in good circumstances, and that the goods contained in the trunks were such as are possessed by people in similar circumstances in life.

The offer was objected to by the defendants, admitted by the court and a bill of exceptions sealed.

The witness testified that the plaintiff had a considerable estate, which was held in trust for her: that she was "of fine social position."

There was much other evidence on behalf of the plaintiff.

The defendants called Arthur Granger, who testified that he was a clerk in defendants' office, having charge of unclaimed packages and undelivered freight; that plaintiff came to the office in April 1870, saying she expected some trunks from New York; the trunks not having then arrived, she came again on the 28th of that month; the trunks had come and were on the platform; she said she had not room to take them then and would call in two or three weeks to say where they should be delivered: she called the third time with her son about a month after the trunks had arrived, to get something out of one of the trunks; she said she had not been able to take the trunks away but hoped to get a house in a short time and would then let me know when they should be delivered.

She never asked witness how long they would keep these goods in the store; he never said they would keep them a year or for

[Adams Express Co. *v.* Schlessinger.]

any less time, witness had no authority to make such promise, his instructions were when such question was asked to say the goods could stay on storage for 90 days, and after that they would be sold for freight; this was on defendants' printed notices; witness did not promise the plaintiff to keep the goods longer than that time, if he had done so it would have been outside of his authority. The trunks were in the store of the defendants eight months, kept safely with other boxes, packages, &c. Plaintiff at no time disclosed to the defendants the value of the contents of the trunks or they would not have permitted them to remain in the store.

The witness gave much more testimony in direct contradiction of most of the plaintiff's statements.

The defendants gave in evidence their petition to the Court of Common Pleas for an order under the Act of December 14th 1863, to sell a number of different packages of goods, including the plaintiff's four trunks, describing them by their marks; also the order of the court dated November 19th 1870, to sell the packages at auction after three weeks' notice in a newspaper, &c.

H. Gorman, an agent of the defendants, testified that neither Granger nor any other clerk had authority to agree to keep the goods for a year; nor for longer than from 60 to 90 days; he testified also to the advertisements and putting up the handbills; the witness superintended the sale of the goods.

There was other evidence in corroboration of the above witnesses and in support generally of defendants' case.

The evidence was that the trunks were sold December 29th and 30th 1870; sale was of each of the trunks separately without being opened or information what were the contents: The product of the sale being $32.50.

The defendants' points with answers were:—

1. That if defendants are liable, they are liable only as gratuitous bailees, without hire, and plaintiff must prove neglect and want of ordinary care, in order to establish liability.

The judge's answer—Yes. "If they offer to deliver the property and were to keep it without compensation, the plaintiff must show either neglect or misconduct."

2. That there is no evidence of neglect or want of ordinary care.

3. That if the evidence shows that Mr. Granger had no authority to contract or promise to keep the trunks for one year, then such promise would not bind the defendants.

These points were refused.

4. That having a lien on the trunks for freight, and not knowing the plaintiff's residence or address, defendants had the right to obtain an order of court for the sale of these trunks; that such order was made, and if complied with, then the defendants are not liable in this action for any amount whatever.

5. That the evidence given by the plaintiff and her son of the

[Adams Express Co. *v.* Schlessinger.]

contents of these trunks in January 1870, is not evidence of their contents at the time they came into defendant's possession in the month of April following, neither plaintiff nor her son having had knowledge of or access to them in the interval, and no one having been examined to show who had the care or custody of them in the interval.

Answer: 'Refused—but I left it to the jury to say whether such evidence was satisfactory, and told them that it should be received with caution, and very carefully weighed and examined."

6. That there is no evidence of the contents or value of these trunks except the son's testimony as to the contents of one trunk at the time he opened it in the basement of the defendants' office, and the testimony of Gorman and Hicks, and the jury must confine themselves to *their* description of contents and value at the time they examined them.

Answer—" Refused."

In his charge, Judge Thayer, after referring to the evidence and its conflicting character, said : * * *

" It is further answered to the statements of the plaintiff, that the clerk had no authority to make any such arrangement, that if he did do it, it was beyond his power to bind the company in any such arrangement—that it was altogether beyond the range of his authority, inasmuch as it was in contradiction of the well established regulations of the company. With regard to this last point, I am bound to say, that although there may have been a lack of authority given to the clerk to enter into any such engagement, yet if, he being an agent of the company, intrusted with the control and management of that department of the business, did in truth and in fact, when applied to for information in regard to it by Mrs. Schlessinger, make the answer which is imputed to him, then the company is bound by it. It is impossible that the public should know all the private regulations of a company engaged in such a business as this. The public have a right to suppose that the agents and officers of such a company are authorized to answer for the company in regard to all matters which are within the scope of the particular duty confided to them. The public have a right to regard the answer of the agent as the answer of the company, if it be an answer connected with the duty which is intrusted to the agent by the company.

" Therefore, if you believe in point of fact that Mr. Granger, or anybody else who had competent authority from the company to attend to this department of the business, did make this answer, then the company are bound by it, although he might in doing that, have exceeded the regulations or instructions of the company on that subject. The important inquiry, perhaps, is whether in point of fact he did enter into such an engagement upon the part of the company, as is alleged. If he did, then the company are bound

[Adams Express Co. *v.* Schlessinger.]

by it.  If he did enter into such an engagement, namely to keep this baggage for a year, then it follows as a necessary consequence that the defendants had no right to sell the trunks within a year, in order to enforce the payment of their lien for freight—at any rate, without demanding the freight. * * * Supposing, however, that no engagement was made by him on behalf of the company to keep the goods for a year, what is then the relative situation of the parties under that aspect of the case? If it is true, as Mr. Granger has testified, that the plaintiff agreed to come very shortly and give such information to the company as would enable them to send these trunks to her, then it was plainly her duty to have complied with that promise.  If she entered into that engagement, she ought to have come within a reasonable time and have taken the trunks away, or given information which would have enabled the company to have delivered the trunks to her; and if she neglected to do that, and left them in the hands of the company against their consent, then the trunks would be there at the risk of the plaintiff so far as all the ordinary accidents and chances to which they were exposed are concerned. . But nevertheless the defendants were bound to take ordinary care of the property while it actually remained in their possession.  In other words, the neglect of the plaintiff to take away the trunks, if she promised to do so, would not justify the defendants in making an improper or illegal disposition of the property, subsequently, if any such disposition was made; nor does it relieve them from that ordinary care which they are bound to take of all property left in their charge under such circumstances.  I do not know that the question of ordinary diligence can arise in any aspect of this case, except one, and perhaps the evidence upon that point is hardly of sufficient magnitude or weight to raise the question.  I shall leave it to you to say whether it does or not.  * * * * * *

If the trunks have been opened by anybody, or the things have been abstracted while in the custody of the defendants, and if that occurred by the negligence or want of ordinary care of the defendants, then they are responsible.  They are responsible for the use of ordinary care in the taking care of the property while it remained in their custody, even though they should be during that period merely voluntary bailees of the goods.

"But the question appears to me to be rather whether the company were guilty of any improper conduct in the subsequent treatment of these goods, and whether they appropriated these goods in any unlawful manner or not.  That seems to me to be the real question in this case rather than any question of negligence, because we can hardly describe that as negligence, perhaps, which is due to the direct and avowed act of the party himself in the exercise of what he claims to have been a legal right.  These goods remained in the possession of defendants until December 1870. * * * They were then sent to

[Adams Express Co. v. Schlessinger.]

auction and sold on the 30th of December 1870, and this is alleged was done in pursuance of an order of the Court of Common Pleas, which, as the defendants say, protects them in having made that sale. They say that, having disposed of the property in a manner provided by law, and under the sanction of an express order of a court of competent jurisdiction, that they are absolutely exempt from responsibility for making that sale.

"Whether they are exempt or not depends upon certain facts in the cause. In the first place, they are not protected by that order if their agent agreed to keep the goods for a year; if that year had not elapsed. In that case they had no right to apply for the order, being bound by the special agreement. If they entered into any such agreement as that which the plaintiff has described, they had no right to make the application to the Court of Common Pleas for the order of sale; and in that case the order would not exempt them from the responsibility for selling the goods. Suppose that their version of the affair is the true one, and that they only suffered the goods to remain temporarily in the premises until the plaintiff should send for them after a brief lapse of time. Then, if the defendants were in no default in that respect, and if Mrs. Schlessinger was in default in not keeping her promise to send for them within a brief period, they had a right to make the application to the court under the Act of 1863, which they did make for the order of the sale of these goods, because they were not bound to keep them for ever after the plaintiff had promised to come for them within a very short time, or to send for them, or to give the defendants information where they could send them. They were not bound to continue to be her bailees for these goods against their own consent; and if she did not comply with her promise they had a right, after the lapse of a reasonable length of time (and I think until the month of December would have been a reasonable length of time, for the goods came in April), to give her notice, and make the application, if they did not know her residence, which they did make to the Court of Common Pleas for the order of sale. If they made that application under such circumstances in good faith, and proceeded to execute the order in good faith, then they would be exempt from responsibility arising from the sale of the property. But a question arises here as to whether they did execute the order, the protection of which they claim. The order of the court, made under the Act of 1863, was made for the purpose of enabling commission merchants, carriers, factors and others to enforce their liens against property in their possession by ordering the sale of the property. The order of the court under the application made in pursuance of the act, was for the sale of the said goods, wares and merchandise. Was that order executed by the sale which was made of this property in the manner in which it was made? Had the defendant any right,

[Adams Express Co. *v.* Schlessinger.]

under an order, to sell trunks locked up without stating whether they had anything in them?—in a lump, without exhibiting them and without any notice of any kind as to the contents of the trunks, so that no one knew whether they contained stones or ingots of gold, valuable or worthless things? Had they any right to execute this order of sale in such a manner as that? In regard to that I am bound to instruct you most emphatically: they had no such right. It was not a proper execution of the order made by the Court of Common Pleas. * * * The defendants were bound to act in good-faith, to have exposed these goods for sale at a public auction after the manner in which goods are usually sold. * * * Therefore I feel bound to instruct you that the defendants did not fulfil this order of the Court of Common Pleas in a proper manner, and that the sale in the manner in which they acted was an improper appropriation of the goods, and was in point of law a wrongful conversion of the goods. * * * If then this sale was conducted in that manner, it was an unlawful sale. It was not such a sale as was ordered by the court and the defendants cannot claim the protection of the order of the court unless they have complied with its terms.

"All that remains for me to say is something with regard to the value of these goods. * * It would be very dangerous indeed for a jury without a knowledge of the actual contents of these trunks to undertake to guess at what might be contained in them, or to undertake to give any large amount representing the value of things which might be contained in these four trunks. The jury in this matter should proceed with as much care and exactness as the evidence will permit. They should bear in mind in considering the evidence of the plaintiff, the natural bias which possibly may have influenced her from her interest in the result of this case—a bias of which she may be unconscious, and which may to a certain extent have affected her testimony, although she may have desired to state nothing but what she believed to be absolutely and strictly true. It is very important to remember the position of the plaintiff and her son, upon whose testimony, so far as the plaintiff's case is concerned, the question of value is to be determined. You are to bear in mind, constantly, their relation to the case and to make such allowance for it as you see proper. Of course no more. It is the plaintiff's duty to satisfy you upon that point. The value of these things is not to be affected by any considerations which are merely personal to the plaintiff herself. The value of this property is not to be affixed by any mere fancies or by any sentiments, however honorable, natural and proper those sentiments may be. An heir-loom in a family, the picture of an ancestor, or a memorial of a friend, may be of inestimable personal value to the owner. There may be sentiments connected with them, which it is impossible to measure by any pecuniary standard. It is not

[Adams Express Co. *v.* Schlessinger.]

by such considerations that you are to arrive at the value of the plaintiff's property, for the law does not recognise any such difficult and impossible standard as a measure of value. It adopts a more practical method of ascertaining the value—a method which can be applied practically to the relations of human life, which is susceptible of some degree of certainty and which in its application will do justice between man and man. Therefore in determining the value of these things you are not to be affected in your estimates by any such ideas as these to which I have referred. You are to set the market value upon each of these articles if you should find for the plaintiff, and you are to determine what each of them is worth pecuniarily—what they would bring if sold at a public sale. * * *

" There is perhaps no discrepancy between the general character and the description of the articles, as testified to by the plaintiff and the defendants' witnesses, though there is a very wide discrepancy in regard to the testimony as to their value and their general condition and quality. I shall leave that question to you entirely, with the remark that it is necessary to be cautious, of course, in estimating the value of such property. I am sure you will look at the subject as men of business and common sense, and if there should be a verdict for the plaintiff, you will affix such a value to these articles as you think they would have brought at a public sale. You are not, if there should be a verdict for the plaintiff, to inflame the damages by affixing any fanciful values, but you should, in doing justice between the parties, affix such a value as you think the articles really and intrinsically possess— such a value as would be represented by the prices they would bring if they had been sold." * * *

The verdict was for the plaintiff for $6000.

The defendants took a writ of error, and assigned for error the rulings on the questions of evidence,—the answers to the points, and, in several specifications, the charge of the court.

*D. Webster* and *T. Cuyler,* for plaintiffs in error.—Granger, the agent of the company, was not acting within the scope of his authority : Story on Agency, sects. 126–132, 302–307, 73 ; Paley on Agency, 198, 199 ; Howard *v.* Brattewaite, 1 Ves. & B. 209 ; Whitehead *v.* Tuckett, 15 East. 400 ; Rosseter *v.* Rosseter, 8 Wend. 494 ; Beals *v.* Allen, 18 Johns. 367 ; Allen *v.* Ogden, 1 W. C. C. R. 174 ; Smith's Mercantile Law, 59 ; Jordon *v.* Norton, 4 Mees. & Wels. 155 ; Condit *v.* Baldwin, 7 Smith (N. Y.) 219 ; Story on Eq. Juris., sects. 344–394 ; Williams *v.* Getty, 7 Casey 461 ; Saving Fund Society *v.* Saving Bank, 12 Id. 503 ; Moore *v.* Patterson, 4 Id. 505 ; Wilson *v.* Wilson, 2 Id. 393 ; Stevenson *v.* Hoy, 7 Wright 191.

25 P. F. SMITH—17

[Adams Express Co. *v.* Schlessinger.]

*M. H. Todd* and *W. L. Hirst*, for defendant in error, cited
Tanner *v.* Oil Creek R. R. Co., 3 P. F. Smith 411.

The opinion of the court was delivered, May 11th 1874, by

MERCUR, J.—The argument in this case has taken a wide range.
The great antiquity of some of the property, as well as the diver-
sified character and alleged value of many of the articles, have
given ample grounds for discussion.

The legal questions to be determined are few.  The jury passed
upon the value of the property, under a careful and restraining
charge of the court.  They were properly instructed as to the
discharge of their duties; under the conflicting evidence, the
measure of damages was properly submitted to them.  We dis-
cover no error in the admission of the evidence; it bore directly
upon the value of the articles, and the probability of their being
in the trunks at the time of the sale by the plaintiff in error.

Much of the argument relating to the question of negligence
does not bear very directly upon the controlling questions in the
case.  The right to recover does not rest upon the careless and
negligent manner in which the property was kept, but on the un-
lawful and irregular manner in which it was sold.  Hence the
omission of the defendant in error to inform the company in regard
to the value of the property, worked no injury to the latter.  The
company did keep it carefully and securely against all injury and
loss.

The count in trover strikes at the invalidity of the sale, at the
time when, and the manner and circumstances under which, it was
made.

The court was entirely correct in holding the company respon-
sible for the agreement of its agent to keep the goods for one
year.  The act was within the general scope of the agent's autho-
rity.  It was a representation made in the course of the business
intrusted to his particular care.  Corporations act through agents.
The public is not informed as to the specific and private instruc-
tions which may be given to them, limiting their ostensible powers.
A just protection to persons dealing with corporations imperatively
requires that the act of the agent, within the general scope of the
business with which he is intrusted, shall bind the company,
although the specific act may be in excess of his private instruc-
tions: Tanner *v.* Oil Creek R. R. Co., 3 P. F. Smith 411.  If the
testimony of the defendant in error was believed, the right of sale
did not exist at that time.

The first and second sections of the Act of 14th December 1863,
Pur. Dig. 220, pl. 6 and 7, under which the plaintiff in error pro-
posed to sell the property, authorized the company to " expose" it
to sale at public auction.  The fair meaning of " expose" in this
statute obviously is " to exhibit," " to bring into view," " display,"

[Adams Express Co. *v.* Schlessinger.]

to "point out or show to the bystanders." Selling the trunks with the goods locked up in them, and describing the contents as unknown, withholds from the bidders all knowledge of the character or value of the contents, and clearly was not within the meaning of the law which directs the manner of sale. This manner of selling goods of value is unjust to the owner. It is no answer for a corporation to say that by this method its sales in the aggregate produce quite as large a sum as if the articles were exposed to view. The company may not suffer, yet great injustice be done to the owner of valuable goods. There is no just reason why his goods should be sold at a sacrifice to enable the almost worthless property of another to be sold for more than its value. Such a mode of selling is unjust to the bidders; generally they will not stand upon equal ground. The strong probability is that the contents will be known to one or more of the agents, and all packages that are really valuable will be struck down at low prices to some one acting in the interest of the knowing agent. In this very case the evidence shows that the contents of the trunks were actually examined by one of the agents of the company before the sale, yet each was sold as contents unknown, for a few dollars. To whom they were sold, or what became of the contents, the evidence fails to disclose.

In the whole record we discover nothing which requires our correction; therefore,                    Judgment affirmed.